Willie Lee **NICKELBERRY**,
Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. A–18167.

Court of Criminal Appeals of Oklahoma.

April 17, 1974.

Don Anderson, Public Defender, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty Gen., Charles P. Rainbolt, Legal Intern, for appellee.

## OPINION

BLISS, Presiding Judge:

The appellant, Willie Lee Nickelberry, hereinafter referred to as defendant, was charged with the crime of Murder and was tried and convicted in the District Court of Oklahoma County for the crime of Manslaughter in the First Degree. He was sentenced to serve a term of twenty-five (25) years in the state penitentiary in accordance with the verdict of the jury, and a timely appeal has been perfected to this Court.

Briefly stated, the facts are as follows: At approximately 2:15 p. m. on the 21st day of December, 1971, Officer J. S. Jackson of the Oklahoma City Police Department was approached by a black female, later identified as Sammye Nickelberry, the wife of the defendant, who related information to him of a possible homicide in

the vicinity of Nicoma Park, Oklahoma. As this was out of the jurisdiction of the Oklahoma City Police Department, Officer Jackson immediately contacted the office of the Oklahoma County Sheriff.

Officer Richard LeGrande then testified that on the date of the occurrence he was a deputy sheriff for Oklahoma County. He and Deputy Lind responded to the call of Officer Jackson and took Sammye Nickelberry in their cruiser and tried to locate the scene of the homicide. Officer Green of the Nicoma Park Police Department subsequently notified them by radio of the location of the victim. When they arrived at the location some one-half mile North of Northeast 36th Street on Indian Meridian, they found a white and blue pickup with the victim, an elderly man, with a small hole in his left cheek lying in the seat. The pickup was stuck in the barditch at the side of the road and Officer Green and the defendant were already at the scene.

Officer Tommy Green testified that on the 21st day of December he was the Chief of Police of Nicoma Park and was searching for a possible homicide suspect at approximately 2:00 p. m. when he saw the defendant some 5 or 6 miles from where the victim's pickup was found. While he was some 100 yards from the defendant, he noticed the defendant make a throwing movement with his arm. After arresting the defendant and advising him of his Miranda rights, he asked the defendant where the gun was, and the defendant nodded his head towards the area where Green had previously seen him make the throwing movement. The defendant then volunteered to take Green to the victim's pickup. Before they left another officer arrived who subsequently found the gun.

On cross-examination Officer Green related the following concerning a statement made to him by the defendant:

"A: Well, we was just going down the road and he was giving me directions, and I asked him, I said what happened, and at that time he told me, said well, me and my wife was having an argument, and said a man in a pickup came along, and said my wife pulled a gun on me, and she couldn't get the safety off so she run over to the pickup to get him to show her how to get the safety off on the gun, and he said I run around there to where she was at and the gun went off, and that's all that was said at that time."

The defendant further related that after the shot the pickup drove further down the road where it ran off into the ditch. The defendant and his wife then got in their car and drove to the pickup, and when the defendant got out to check on the driver, his wife drove off and left him.

Deputy LeGrande then testified on direct examination concerning certain statements made to him by the defendant as follows:

"A: Yes, sir. His response to this was that he was not going to take it by himself; that his wife had shot him.

Q: All right. What else did he have to say about it?

A: The conversation run pretty much the same on this. We asked him —I'm sure we asked him a few preliminary questions, but the whole thing just reverted back to this, that he stated that his wife had shot Mr. Douglas.

Q: All right, now I want to go into more detail. Did he tell you how, where he had first met or got with his wife that day?

A: He stated that they had been arguing and were—they had a great deal of domestic trouble; stated that he had picked her up at her residence which is on Northeast 52nd, I believe; that they had argued back and forth to the point there at just south of Northeast 50th on Indian Meridian Road. This is where the altercation took place.

Q: Did he mention when the gun first came into existence or who first had it?

A: Yes, sir. He stated that his wife had got out of the car, or they were out of the car—I'm not sure —I don't remember just that close; that his wife had gone to the pickup Mr. Douglas was in and kept asking Mr. Douglas how to get the safety off of the gun and that was—"

"Q: Did he say what happened after the gun went off or where he was when the gun went off?

A: He stated that she ran to the car and drove off, dragging him. Now, I'm not sure whether they drove to where the pickup was after the altercation or whether she drove off dragging him from the scene there just south of Northeast 50th.

Q: Did he indicate that the argument continued and they were having an argument at that time?

A: The argument was there when Mr. Douglas pulled up. They were having this argument, yes, sir.

Q: Did he tell you the reason that Mr. Douglas pulled up or if anything happened to cause Mr. Douglas to stop there?

A: As I recall, he stated that his wife had sort of flagged him down or yelled at him or something, one of the two, flagged him down or yelled or run out in the road or something?"

On cross-examination Officer LeGrande gave the following answers to the following questions:

"Q: Now, during the struggle—did Willie Nickelberry say anything in your presence that you can recall about Mrs. Nickelberry trying to kill him, trying to kill Willie here, or was going to shoot him with this gun?

A: Yes, sir.

Q: And that he struggled with her, and that in his wrestling, some way got the gun away from her, and that the pickup drove on down the road, and after he wrestled the gun away from her, the two of them got in the car and proceeded on down to where the pickup was in the ditch stuck, and at that time got out, Willie got out of his car and went over to see about Mr. Douglas, and at that time she slammed the door shut and proceeded to drive off and he ran back and grabbed ahold of the door and that's where she drug him on down the road a ways, is that right?

A: It could be. It could very well be.

Q: Does that strike a familiar note with you?

A: Yes, it sounds better, yes, sir."

Dr. Charles E. Marshall then testified that he was a pathologist and a consultant for the Chief Medical Examiner's Office for the State of Oklahoma. He performed an autopsy upon the body of the deceased and determined that the cause of death was a gun shot wound in the neck. He also recovered the bullet from the body and turned it over to a deputy sheriff.

Mr. Ray Lambert then testified that he was a firearms examiner for the State Bureau of Investigation, that he performed certain ballistics tests, and that it was his opinion that the bullet taken from the decedent's body was fired from the gun found by the officers. The State then rested.

After the trial court overruled the defendant's demurrer to the evidence and motion for a directed verdict of acquittal, the defendant took the stand and testified in his own behalf. On direct examination the defendant gave his account of the incident as follows:

"A: Yes, sir. We went for this ride on the 21st and we were sitting there talking, and we got into an argu-

ment about the girl that I used to go with, and so I got after her about the guy she was fooling around with, so we argued there for a little while, so she started calling me some bad names, and we passed a lick or two, and then she jumped out of the car, grabbed her purse. When she jumped out of the car on the right side, I jumped out of the car on the driver's side, and we both met at the back end of my car. When we met at the back end of my car, she come out with this little gun, and I seen it, and I rushed her, and grabbed at it, and while I was tussling with her trying to take the gun, well, we saw this pickup coming. We was out in the road. We had wrestled away from behind the car out in the road, so the pickup truck would have had to stop whether she flagged it or not—it would have had to stop because if it hadn't he would have run over us.

Q: Did she flag it?

A: Yes, sir, she flagged him before he got to us, and then she broke to the truck. I was holding her around the waist, and had this arm on the hand she had the gun in, and her hair was in my face but I—as she opened the door of the truck, Mr. Douglas, he seen the gun, and he leaned back over to the far side of the truck, the driver's side, and when he leaned back over to the driver's side, she tried to pull herself up in the truck, but when she did that, I was trying to pull her out, and when the gun fired she fell back out of the truck, like as if she was kicked by his feet. When she fell back out of the truck, that's when I wrestled her and took the gun away from her, and the truck drove off. When the pickup drove off, she turned the gun loose and we got in the car. I seen the

truck when it run off in the ditch. I thought maybe he run off in the ditch looking back, looking back at us fighting, so I made her get back in the car. We got back in the car and we drove on up there to where the truck was in the ditch. I gets out of the car and I leaves my door open, and I said, well, I'm going to see if I can help him because I don't want him to have us arrested for being out here fighting. I'm going to see if I can help him. I'll call one of our wreckers to get him out, so I got out of the car, proceeded across the road. Before I got to the truck, I got within about ten feet of the truck, he was still yet trying to get out of the ditch. His wheels were spinning and his motor was running real fast, and I guess he got scared. I guess he figured I stopped there to do something to him, but I only stopped to help him to keep him from turning us in, so when I started across the road, I heard my car door slam. My car door slammed, and I turned around and grabbed hold of the handle. When I grabbed hold of the handle, she taken off up the road. She took off up the road, and I run along side of the car. I still yet had the gun, but I had stuck it in my pocket.

Q: How long had it been in your pocket?

A: Just no sooner than she took off, I was trying to find a place to grab. I had to run along side the car, stuck it in my pocket. I was trying to find a place that I could grab with this other hand. This hand here was on the driver's door, and I couldn't catch hold of nothing. That's when I stuck the gun in my pocket with this hand, so she drug me I guess about two blocks. Well, she started going so fast she pulled my feet out from under me, so I

seen the back wheels of the car was sucking me under the car so I put my shoulder up against the car and she was dragging me, and I threw myself back to the side of the road. When I threw myself back to the side of the road, I got up. The pickup truck was still yet trying to get out of the ditch. The smoke was coming from it just like he was really in a hurry to get out. Well, I couldn't help him because my knees and my hands was bleeding. I said, well, I'm out here by myself so I'll just start walking, so I did. I proceeded to go across the field. I cut across the field. I had walked I'd say from about 10:30 that morning up until in the evening, I had walked about five or six miles, but I was walking at an angle, because from where this had happened at, I came out almost at Choctaw."

On cross-examination the defendant admitted that he and his wife had had an altercation earlier that morning and that his wife's lip had been split. He further stated that she had the gun at that time, although she did not attempt to use it, and that she got dressed and came in the car with him. He further testified that he thought she had left the gun at home and that she accompanied him of her own free will.

The defendant in his brief urges that the trial court failed to properly instruct the jury. With this contention we wholeheartedly agree. The relevant instructions submitted by the trial court to the jury are as follows, to-wit:

## INSTRUCTION NO. 4

Under the law, the killing of one human being by another is known as homicide.

## INSTRUCTION NO. 5

As applied to this case, homicide is either: (1) murder, or (2) manslaughter in the first degree.

## INSTRUCTION NO. 6

Homicide is murder in the following cases: (1) when perpetrated without authority of law and with a premeditated design to effect the death of the person killed.

## INSTRUCTION NO. 7

You are instructed that a design to effect death is inferred from the fact of the killing, unless the circumstances raise a reasonable doubt in your minds as to whether such design existed at the time of the killing. A design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution.

## INSTRUCTION NO. 9

Homicide is manslaughter in the first degree in the following cases:

1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon.

## INSTRUCTION NO. 12

The defendant, Willie Nickelberry, has interposed as his theory of defense in this case that at the time of the alleged homicide he was acting in his own defense to disarm his wife and that the gun was discharged while he was attempting to wrest the gun from his wife, and that the death of Lowry D. Douglas occurred without intent on the part of the defendant to kill the said deceased, and that as to this defendant the death was without intent and was accidental.

Therefore, if you so find, or if you entertain a reasonable doubt thereof, you must find the defendant not guilty.

After examining the record as a whole it is the opinion of this Court that there was insufficient evidence, circum-

stantial or otherwise, before the trial court which, if believed by the jury, would support a conviction of murder. The trial court should not instruct upon any degree of a crime of which there is no evidence tending to show the defendant's guilt. See Rhoades v. State, 16 Okl.Cr. 446, 184 P. 913. Therefore the trial court should have eliminated the instruction on murder. Hodges v. State, 65 Okl.Cr. 277, 85 P.2d 443. There was no evidence presented to the jury tending to prove that the homicide was "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon." Therefore the trial court should have eliminated the second portion of its Instruction No. 9 concerning manslaughter in the first degree.

█ The only offense which the evidence tended to prove was manslaughter in the first degree arising out of the misdemeanor-manslaughter doctrine. However, the trial court failed to instruct the jury as to the misdemeanor or predicate upon which the theory of the State rested, and further failed to instruct that the death must be a proximate result of said unlawful act.

This Court has held on numerous occasions as follows:

> "Where a defendant is convicted of manslaughter causing death while engaged in the commission of a misdemeanor, the unlawful act relied upon as a predicate for manslaughter must be the proximate cause of death. Ordinarily the jury should be instructed in substance that, if they have a reasonable doubt as to the unlawful act being the proximate cause of death, they should acquit; in such case the instruction need not be in any particular words so long as the jury is correctly informed that the unlawful act must be the proximate cause of death."

Logan v. State, 42 Okl.Cr. 294, 275 P. 657; and Lime v. State, Okl.Cr., 508 P.2d 710.

Therefore for all the reasons set out above it is the opinion of this Court that the judgment and sentence appealed from should be and the same is hereby reversed and remanded for new trial on the charge of Manslaughter in the First Degree.

BRETT and BUSSEY, JJ., concur.